### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____
                                    )

**IN RE LORAZEPAM & CLORAZEPATE**    )     **MDL No. 1290**
**ANTITRUST LITIGATION**                 )     **Misc. No. 99ms0276**
_____)
                                    )

**BLUE CROSS BLUE SHIELD OF**       )
**MINNESOTA, BLUE CROSS BLUE**     )
**SHIELD OF MASSACHUSETTS, and**   )
**FEDERATED MUTUAL INSURANCE**   )
**COMPANY,**                          )
                                    )
          **Plaintiffs,**          )
     **v.**                           )     **Civ. No. 02-1299 (TFH)**
                                      )

**MYLAN LABORATORIES, INC., et al.,**  )
                                    )
        **Defendants.**         )
_____)

### PLAINTIFFS' MOTION FOR ENTRY
### OF JUDGMENT FOR TREBLE DAMAGES

Plaintiffs Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Minnesota, and Federated Mutual Insurance Company (collectively, "Plaintiffs"), by and through their counsel, hereby bring this Motion for Entry of Judgment for Treble Damages to comply with the Court's direction at the close of the trial to submit a judgment incorporating treble damages as a result of the jury's willfulness finding.[1] *See* Morning Tr. June 1, 2005 at 16:22-25. The applicable state laws in this case mandate multiple damages. Under Massachusetts law, the court has discretion to award double or treble damages while under Minnesota law trebling is mandatory. Further, under Massachusetts law, the jury's finding -- supported amply by the evidentiary record -- of

---

[1] On June 3, 2005, judgments were entered on the jury's verdict by the Clerk of Court.

willfulness as to all Defendants requires entry of a verdict awarding BCBSMA its multiple damages against all three Defendants, severally, and without contribution.

## I. Introduction

"Every violation of the antitrust laws is a blow to the free enterprise system envisaged by Congress." *Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 262 (1972). Our system depends on strong competition, which, in turn, depends on compliance with the antitrust laws.  This case demonstrates the vulnerability of certain markets to the anticompetitive acts of companies like Defendants who demonstrate disdain for the very thing the antitrust laws are designed to protect, as the evidence and the jury's finding of willfulness make clear.  Treble damages are especially important in this case because, as the evidence in this case shows, and as the jury found, Mylan raised its prices for lorazepam and clorazepate above competitive levels with a sophisticated, carefully planned and executed attack by Defendants directed at the competitive forces that drove price competition. Accordingly, this Court should impose the fullest possible measure of damages as the penalty in this case.  Doing so is essential to deter Defendants and other companies like them from engaging in willful antitrust violations like those that have been established to the jury's satisfaction in this case.  And, that is particularly important, as here, in markets which are especially vulnerable to the combination of agreements and illicit coordinated interaction that enabled Defendants to extract hundreds of millions of dollars in profits.

The jury found Defendants' actions willful.  That determination could only have been made by a finding that the Defendants' actions were so egregious as not to fall under some negligent or lesser standard.  In fact, Defendants' outrageous and willful

conduct exemplifies the very type of anticompetitive conduct that the antitrust statutes were designed to deter. The imposition of treble damages is wholly supported by the facts of this case and the state laws of Massachusetts and Minnesota.

## II.  Background

The jury found the Defendants acted willfully, *see* Verdict Form at 5, which according to the Court's instruction meant that the jury found the Defendants "intend[ed] to commit actions that would result in monopolization, attempt to monopolize, restraint of trade or conspiracy to restrain trade." *See* Jury Instructions at p. 65.  The jury's verdict follows the six-year history of this case, in which Defendants' scorched-earth litigation tactics gave rise to contentious and costly litigation, requiring the expenditure of enormous resources by Plaintiffs.   Unrepentant throughout this litigation, Defendants have insisted that others were responsible, not them, including pharmacies, PBM's, even the Plaintiffs themselves:   "And I am going to show you how Mylan's conduct had nothing to do with what happened to these insurance companies.  Much of it was their own fault…."  Defendants' Opening Statement, Afternoon Tr. May 4, 2005 90:13-16. Or it was "[t]he legal tactics of the brand name drug companies" that have contributed Mylan's cost of doing business.  *Id.* at  85:12-13.  Specious reasons for engaging in anticompetitive conduct also took the form of public policy pronouncements.   For example, Mylan proclaimed it was taking a leadership position to reform the industry because Congress was failing to regulate brand competitors. *See* PEX 5101 (Deposition of Milan Puskar, 179:12-180:2)[2]; PEX 1236[3]; PEX 797.

---

[2]        Mr. Puskar citing need to raise generic drug prices due to litigation initiated by the brand drug companies.

Defendants even went so far as to re-label the Exclusive Agreements as "Supply Agreements" in open court and in briefing, a label they conspicuously abandoned at trial (s*ee, e.g., Corrected Memorandum in Support of Defendants' Joint Motion for Summary Judgment for Failure to Establish Liability* at 10). Even in the face of prior settlements totaling over $178 million, rather than accept responsibility for their multiple violations of law, Defendants denied any wrongdoing and instead have claimed that their former counsel committed malpractice by advising them to settle.

Before Defendants' illegal Exclusive Agreements and the associated anti-competitive conduct, lorazepam and clorazepate were safe, cost effective anti-anxiety medications that were widely relied on by millions of Americans to control their illnesses. Morning Tr., May 10, 2005 at 72:6-8, 74:2-11. Rod Jackson, the Mylan Vice President who implemented these price increases, was well aware that these were drugs relied upon by patients, including psychiatric patients, to control their medical conditions. Afternoon Tr., May 17, 2005 at 76:5-8.

The trial testimony clearly proved that Defendants, acting in concert, undertook a purposeful scheme to cut off their competitors from raw materials, thus facilitating the implementation of supra-competitive price increases. Mylan, Gyma, and Cambrex/Profarmaco[4] willfully acted in concert to violate the antitrust laws and attack competition in the generic lorazepam and clorazepate drug market. This scheme was conjured up by old, dependable business partners. Mylan had a 25-year relationship with

---

[3]      Mr. Puskar notified Senator John McCain that "[w]e have attempted, without success to bring the [brand industry's anti-consumer campaign] to the attention of Congress."

[4]      Cambrex is a United States corporation that purchased Profarmaco. Profarmaco is now a wholly-owned subsidiary of Cambrex and had been during the 1996-97 time frame. Afternoon Tr., May 5, 2005 at 59:10-20; Afternoon Tr., May 6, 2005 at 77:8-9 (Russolo testified that Cambrex is the sole owner of Profarmaco).

Gyma and an "excellent" relationship with Cambrex/Profarmaco.  Afternoon Tr., May 5, 2005 at 51:6-9, 57:11-16.  Once Milan Puskar conceived of his plan, he directed Richard Stupar to contact Harold Lipton, President of Gyma, to inform him what Mylan was hoping to achieve by entering into the Exclusive Agreements.  Morning Tr., May 6, 2005 at 45:3-11.  Soon thereafter Mylan contacted Profarmaco and its U.S. owner Cambrex to explain the plan.

Cambrex/Profarmaco and Gyma were attracted to Mylan's scheme to enter into an exclusive agreement to cut off Mylan's generic competitors in the lorazepam and clorazepate markets and to raise prices to make more profits.  Morning Tr., May 6, 2005 at 54:20-56:7.  Paolo Russolo, Managing Director of Profarmaco, and Harold Lipton already knew of the details of the plan before the meeting in Bologna, Italy.  Morning Tr., May 6, 2005 at 53:10-54:8.  As Russolo conceded at trial, "[t]he purpose of the exclusive agreement was not to give the product to the other two [Purepac and Watson]" -- the two "most important" players in lorazepam and clorazepate generic markets.  Afternoon Tr., May 6, 2005 at 97:4-14; 99:19-25 (Russolo confirming the purpose of the agreement was explicit).

Both before and at the meeting in Bologna, Mylan, Gyma, and Cambrex/ Profarmaco agreed that a 15% royalty to Gyma and Cambrex/Profarmaco for lorazepam would suffice (as opposed to 25%).  This occurred because all three companies had agreed that it was important for them "to bring FIS [the only other API supplier for lorazepam API] into the fold" to guarantee domination of the market.  Morning Tr., May 6, 2005 at 67:20-68:15, 68:16-19 (Q. "You now had a group of three Profarmaco, Gyma, and Mylan and you wanted to make a group of four that included FIS."  A. "Yes.").

Cambrex was an active player during the negotiations over the Exclusive Agreements.  In August, 1997, Mr. Russolo of Profarmaco indicated that he would have to discuss the plan with Cambrex, Profarmaco's parent company.  Morning Tr., May 6, 2005 at 100:11-17.   Claes Glassell, the President of the Fine and Pharmaceutical Chemicals Group of Cambrex Corporation, also attended a meeting with Richard Stupar, Milan Puskar, and Hal Lipton in New York in November, 1997 to finalize the details of the deal.  Morning Tr., May 6, 2005 at 100:18-101:7.   On the eve of executing the Agreements, Cambrex refused to enter the deal until Mylan paid an up-front, cash $3 million licensing fee.  Morning Tr., May 6, 2005 at 101:10-20.

Any ambiguity about the intent of Defendants' actions was clarified when Mylan's own President and CEO, Milan Puskar, agreed in his deposition that the purpose of the agreement was to cut off  Profarmaco supply to Mylan's competitors.  PEX 5105, Puskar transcript at 51.[5]  Despite plans for more than 2500% price increases, Mr. Puskar was indifferent to the impact upon consumers and their health plans. *Id*. at 275-6. Mylan's callous disregard for the effects that this price increase had on its customers and their health plans is best exemplified by Rod Jackson, who was placed in charge of handling complaints.  When Stephanie Heitmeyer raised concerns how this would impact her managed care customers, Mr. Jackson responded with the expletive "Fuck the customer."   Afternoon Tr., May 9, 2005 at 45:24 – 46:14.[6]   Michael Reicher also confirmed that this phrase was used by both Mr. Jackson and Mr. Puskar (*Id*. at 79:13-

---

[5]  Defendant Mylan also did profit projections where it assumed it would be the only competitor in the market.  *Id*. at 88-9.

[6] Mr. Jackson only half-heartedly denied this accusation, explaining if he said it, "it would not be a very proud day."  Afternoon Tr., May 17, 2005 at 69:5-7.

15), and further explained that he made a desperate plea to Mr. Puskar not to go forward, but that Mr. Puskar "was not sympathetic at all" to the customers. *Id*. at 77:19-78:17.

Having ignored its own internal dissent about how the price increases would impact managed care plans, Mylan lied to numerous individuals and groups as part of the conspiracy to raise and sustain the price increases. One, in September 1997 it sent out a memo to all group purchasing organizations discontinuing lorazepam effective November 1st, 1997 due to raw material shortages. PEX 1018. Mr. Puskar himself acknowledged in his deposition that there had been no such shortage, and even went so far as to blame the memo on Dan Dorsey who was purportedly fired for sending out the memo. PEX 5105 at 126-9.[7] Mylan also lied to the Health Care Finance Administration ("HCFA") to get Federal Upper Limit ("FUL") reimbursement caps removed. Mylan had to change the applicable FUL used by HCFA (as well as the related maximum allowable cost ("MAC") caps used by the private sector) because, if Mylan priced its product above the caps, nobody would buy Mylan product. Afternoon Tr., May 10, 2005 at 41:7-42:25. When writing to HCFA, Mylan misrepresented the number of manufacturers selling lorazepam to obtain removal of the cap. *Id*. at  43; PEX 763.

With the illegal Exclusive Agreements in place, it was undisputed that Mylan raised its prices on lorazepam and clorazepate between 1,935% and 3,219% (PEX 1010). While Defendants withdrew from the ten-year Exclusive Agreements at the end of 1998, and Mylan's net (wholesale) price fell eventually over time, their artificially inflated retail prices have remained high through and after 2003. As Dr. Craig Stern explained,

---

[7] There were several inconsistent reasons given for Mr. Dorsey's termination. By far the most plausible was his disagreement with Rod Jackson's assessment of the marketplace. Morning Tr., May 18, 2005 at 18:18-19:19.

Mylan set the AWP or retail prices for its product. Afternoon Tr., May 10, 2005 at 51:17-18.  At the retail level, Mylan could not price its product higher than 90% of the brand price without being reclassified as a branded product.  *Id*. at 52:19-53:4.  So, Mylan set the price of lorazepam at 90% of the brand, the highest possible price it could charge.  *Id*. at 53:16-55:9.  The evidence showed that Mylan specifically wrote its Dear Pharmacist letter to its customers, explaining that its new pricing structures would mean increased profits.  *Id*. at 60:18-61:12.  Mylan continued to keep these prices high, even after its wholesale prices fell, which enabled it to pass this "spread" onto its wholesale customers. *Id.* at 64:22-65:14.

The evidence at trial established that consumers and their health plans (including Plaintiffs) were forced to absorb Mylan's unprecedented price increases.  Collectively, consumers and their health plans have paid over a billion dollars in overpayments for these products.  Morning Tr., May 12, 2005 at 89:15-90:7.  Mylan received such a large volume of complaint calls it actually shut down their phone banks.  PEX 5105, Roger Foster Deposition at pp 99-100.  Mylan did not decrease its prices in response to any of these consumer complaints.  *Id*. at p. 111-12, 136.

Rather than adjust prices, Mylan lied about the reasons for the price increases, and waged a public relations campaign against the brand companies with a varying message depending on the audience.  Letters to pharmacists blamed price increases on the fierce competition in the generic market.  PEX 230, 774.  To consumers, the price increases were blamed on the "brand name pharmaceutical industries' costly and anti-consumer campaign" and their "campaign to prevent competition."  PEX 5105, Roger Foster

Deposition at 140-2; PEX 797.  Other Mylan customers were told lorazepam was being discontinued due to a severe raw material shortage.  PEX 1018.

Mr. Puskar wrote to Senator McCain to justify the price increases, explaining that Mylan was experiencing losses "on products such as lorazepam."  PEX 1236.  Mylan's own internal analysis, however, as well as Milan Puskar's deposition testimony confirmed otherwise.  PEX 1052, 1103, PEX 5101, Milan Puskar Deposition at 190-192.  However, neither the product analysis reports nor the supporting financial information was ever provided to Senator McCain.  PEX 5105, Roger Foster Deposition at 51-56.

The jury's willfulness finding was well-grounded in the evidence.  This was not a case of negligence or even gross negligence.  This was a joint, willful effort by all three Defendants to violate the antitrust laws.  Taken together, the jury's willfulness finding and the Defendants' complete lack of contrition for their conduct justify an award of treble damages.

### III. <u>Argument</u>

In reaching the willfulness finding, the jury could reasonably weigh the evidence pointing to Defendants' elaborate and calculated scheme to violate the antitrust laws, foreclosure in the market, and likewise discount the credibility of Defendants' witnesses and evidence to the contrary. *See* Jury Instructions at p. 20.  For example, the jury could properly discount Mr. Jackson's incredible testimony that he did not know what the purpose of the agreement was, and that the price increases he instituted had nothing to do with the Exclusive Agreements.  Afternoon Tr., May 17, 2005 at 86:24-94:6; PEX 5105

(Deposition of Milan Puskar, 53:19-54:05).[8]  In addition, the jury could discount Dr.
Gary Roberts' testimony that no amount of collusion or exclusionary conduct would be
impermissible, even if it resulted in prices that were higher than competitive levels as
long as there is some price competition at the artificially higher levels.  Morning Tr., May
23, 2005 at 88:12-91:25.  The significance of this less than credible evidence presented
by the Defendants illustrates the same unmitigated disdain Defendants harbor for the civil
justice system that they held for the competitive forces that are vital to our economy.

A.    **THE POLICY UNDERLYING TREBLE DAMAGES AND THE
      EGREGIOUS FACTS OF THIS CASE COMPEL AN AWARD OF
      TREBLE DAMAGES.**

       The purpose of treble damages provisions in antitrust law is to penalize
wrongdoers for their conduct, deter future wrongdoers from engaging in similar
anticompetitive conduct, and, most importantly, to provide a remedy to parties injured by
said anticompetitive conduct.  *Am. Society of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456
U.S. 556, 575 (1982);  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485
(1977).  By awarding treble damages in accordance with Plaintiffs' state antitrust laws,
this Court will properly punish Mylan, Gyma, and Cambrex each for their sophisticated
attack on competition in the lorazepam and clorazepate generic drug markets, and for
causing massive overpayments by Plaintiffs.  Additionally, trebling damages will serve as
notice to these major players in the generic drug industry, and to the industry as a whole,
that future anticompetitive conduct of this nature will not be overlooked nor tolerated.

       The Supreme Court has stated, "[t]he very idea of treble damages reveals an intent
to <u>punish</u> past, and to <u>deter</u> future, unlawful conduct, not to ameliorate the liability of

---

[8] Mr. Puskar specifically stated that he told Gyma and Profarmaco that the Exclusive Agreements
would <u>help</u> <u>increase</u> <u>prices</u> and eliminate competition.

wrongdoers." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) (holding that neither the Sherman Act nor the Clayton Act confer a right of contribution in antitrust treble damage actions, noting that Congress was not "concerned with softening the blow on joint wrongdoers.") (emphasis added). Areeda & Hovenkamp have also noted the deterrent value of treble damages:

> The cost of treble damages to the defendant may be very high indeed. Such awards generate a powerful financial incentive for injured persons to detect, disclose, attack, and end violations of the antitrust laws. Private enforcement thus increases the likelihood that a violator will be found out, greatly enlarges the penalties, and thereby helps discourage illegal conduct.

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 330b, at 273 (2d ed. 2000).

The elements justifying the "powerful financial incentive" for treble damages are clearly present here. "The availability of a private antitrust action, and its accompanying treble damages remedy, serves both to compensate private persons for their injuries and to punish wrongdoers." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 805 (D.C. Cir. 2001) (citing Areeda & Hovenkamp, ¶ 330 at 273); *Mitsubishi Motors Corp. v. Soler Chryler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) ("The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators . . . .").[9]

---

[9] Other commentators have noted the power of the treble damages remedy to promote enforcement and deterrence. *See* Brodley, "Antitrust Standing in Private Merger Cases: Reconciling Private Incentives and Public Enforcement Goals," 94 Mich. L. Rev. 1, 11-13 (1995) (recognizing that the Supreme Court often emphasizes the key importance of deterrence); Kenny & Jordan, "*United States v. Microsoft:* Into the Antitrust Regulatory Vacuum Missteps the Department of Justice," 47 Emory L.J. 1351, 1360 (1998) (treble damage provisions provide strong incentives to private parties to deter anti-competitive conduct); Waller, "Private Law, Punishment, and Disgorgement: The Incoherence of Punishment in Antitrust," 78 Chicago-Kent L. Rev. 207, 212-13 (2003) (antitrust treble damages must be considered an explicit form of punishment).

Aside from the punishment and sentinel effects of treble damages, the primary purpose of the treble damage provisions under antitrust law is to provide a powerful remedy to parties actually injured by illegal, anticompetitive conduct. *See Brunswick Corp.,* 429 U.S. at 485-86 ("It nevertheless is true that the treble-damage provision, which makes awards available only to injured parties, and measures the awards by a multiple of the injury actually proved, is designed primarily as a remedy."). Treble damages "make the remedy meaningful by counterbalancing 'the difficulty of maintaining a private suit against a combination such as is described' in the Act." *Id.* at 486, n. 10 (quoting Senator Sherman, 21 Cong. Rec. 2456 (1890)).

Awards of treble damages provide a strong incentive for parties like Plaintiffs, who have suffered millions of dollars of actual injury, to pursue very costly private actions against well-heeled business entities who violated antitrust law and caused real damage.[10] *Id.* Congress intended for antitrust laws to have such an effect. *Brunswick Corp.,* 429 U.S. at 486 n. 10 ("These actions were conceived primarily as 'open[ing] the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and giv[ing] the injured party ample damages for the wrong suffered." 51 Cong. Rec. 9093 (1914) (remarks of Rep. Webb regarding enactment of Clayton Act) (emphasis added)). The Supreme Court has been unequivocal in explaining the importance of the remedy of treble damages in private antitrust actions:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. In enacting these laws, Congress had many

---

[10]   The provisions of Minnesota's Antitrust Law,  Minn. Stat. § 325D.57, "reflect a clear legislative policy encouraging aggressive prosecution of statutory violations." *Minnesota ex rel. Humphrey and Blue Cross and Blue Shield of Minnesota vs. Philip Morris, et al.*, 551 N.W.2d 490, 495 (Minn. 1996). This includes mandatory treble damages, as well as the grant of attorneys' fees and costs.

means at its disposal to penalize violators.  It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations.  But this remedy was not selected.  Instead, Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation.  By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as "private attorneys general."

*Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972).  This Court has also recognized the important policy behind awarding treble damages in antitrust actions, remarking, "[t]he treble damages provision of the Clayton Act, 15 U.S.C. § 15, was designed to encourage private enforcement of the antitrust laws by offering generous recompense to those harmed by the proscribed conduct and simultaneously to erect a deterrent to those contemplating similar conduct in the future."  *In re Vitamins Antitrust Litigation*, 209 F.R.D. 251, 258 (D.D.C. 2002) (Hogan, C.J.).

The genesis of the trebling provisions in antitrust law has been restated numerous times by the Supreme Court and its progeny cases.  The Massachusetts and Minnesota statutes being litigated in this case spring from this rich federal history as exemplified by their making multiple damages mandatory against anyone found liable for willful violations.  This case contains the exact facts for which the federal and state antitrust laws envisioned such harsh remedies – actors that have no contrition and would do it all the same again if given the chance.

### 1.      The Facts Amply Support Assessment of Treble Damages.

Treble damages must be assessed against Mylan, Gyma, and Cambrex to punish them for their willful, unlawful anticompetitive conduct.  Their actions caused extensive damage not only to Plaintiffs, but to all lorazepam and clorazepate consumers and their

health plans in the United States.  The Defendants each succumbed to corporate greed, engaged in a deliberate and patently illegal scheme to stifle competition, and reaped a massive windfall.  Defendants succeeded in their plan -- Mylan's net sales for lorazepam and clorazepate increased $154 million from 1997 to 1998 alone.  Rebuttal Expert Report of Atanu Saha ("Saha Rebuttal") DX 7017 at 6; Morning Tr., May 12, 2005 at 71:1-2 (noting that "profit went through the roof").

Even after the Exclusive Agreements were terminated in 1998, Defendants continued to benefit from supra-competitive prices Mylan had set.  Likewise, the Plaintiff health plans have continued (and still continue) to pay prices above the 1997 pre-Agreement competitive equilibrium.  To date, Defendants have been forced to disgorge only a minimal portion of their profits generated as a result of the Exclusive Agreements. Defendants paid a total of $178 million in settlements with the FTC, States, and direct and indirect purchaser class actions, all the while denying any liability and never lowering the retail prices to pre-monopoly levels.[11]   The settlement amounts barely exceed the windfall Defendants received in 1998 alone, and represent only a small fraction of the $1 billion of overpayments suffered by lorazepam and clorazepate consumers and their health plans.

Plaintiffs are entitled to treble damages based on the jury's finding of willfulness, the operative state laws, and compelling public policy reasons.  The jury unanimously found that all three Defendants – Mylan, Cambrex/Profarmaco and Gyma – each

---

[11] In 2001, Defendants paid $108 million to settle claims brought by the FTC and thirty-three states as a result of their conduct.  *In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 369 (D.D.C. 2002).  In 2001, Defendants paid $35 million to settle a class action of third-party payor claims. *Id.*  In 2003, Defendants paid $35 million to settle a class action of direct purchaser claims.  *In re Lorazepam & Clorazepate Antitrust Litigation*, Civ. No. 99-0790, 2003 U.S. Dist. LEXIS 12344 (D.D.C. June 16, 2003).

committed <u>willful</u> violations of the Plaintiffs' state antitrust/consumer protection laws. *See* Verdict Form at p. 5.  The jury calculated Plaintiffs' actual, single damages as follows:  BCBS of Massachusetts - $8,430,887; BCBS of Minnesota - $1,756,096; and Federal Mutual Insurance Company - $410,878.  Under the Plaintiffs' state laws, these damages must be trebled.  Finally, as explained below, the punitive assessment under Massachusetts law must be made against each Defendant individually, and not as a joint and several award.

**C.**     **UNDER MASSACHUSETTS CHAPTER 93A, BCBSMA MUST BE AWARDED TREBLE DAMAGES.**

   **1.**     **Multiple Damages Must Be Awarded For Defendants' Willful and Knowing Violation Of Chapter 93A.**

Because the jury found each Defendant's actions were willful violations of Massachusetts law, the jury award to BCBS Massachusetts ("BCBSMA") in the amount of $8,430,887 should be trebled.  Chapter 93A requires the Court to award

> up to three but not less than two times [the amount of actual damages] if the court finds that the use of employment of the act or practice was a willful or knowing violation of said section two <u>or</u> that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.

Mass. Gen. Law ch. 93A § 9(3) (emphasis added).

The Court must award multiple damages if the fact-finder makes a determination that Defendants engaged in willful or knowing violations of 93A.  *Id*. § 9(3); *see Wang Labs., Inc. v. Bus. Incentives, Inc.*, 501 N.E.2d 1163, 1166-67 (Mass. 1986) (where Supreme Judicial Court of Massachusetts found relevant conduct of Defendant "willful," it remanded to trial court for finding of double or treble damages).  Willful and knowing violations of Chapter 93A trigger multiple damages because the provisions of 93A are

"directed against callous and intentional violations of the law and permit[] recovery of multiple damages on a showing that the Defendant willfully or knowingly employed an unfair or deceptive practice."  *Heller v. Silverbranch Constr. Corp.,* 382 N.E.2d 1065, 1071 (Mass. 1978) (citing Rice, "New Private Remedies For Consumers: The Amendment of Chapter 93A," 54 MASS. L. Q. 307, 318 (1969)).

The jury has already resolved any question as to Defendants' willfulness.  The jury unanimously concluded not only that Mylan, Cambrex, and Gyma were each responsible for BCBSMA's damages, but that Plaintiffs proved by a preponderance of the evidence that each Defendant's violations of the antitrust laws was willful.  *See* Verdict Form at 5.  This factual finding alone triggers multiple damages under Chapter 93A.

**2.      Defendants Failed To Make a Reasonable Settlement Offer Upon BCBSMA's Demand.**

Defendants are also subject to multiple damages because they failed to make reasonable settlement offers to BCBSMA, ignoring the opportunity to limit their exposure to multiple damages.  Chapter 93A § 9 requires parties seeking damages under the statute to send a written demand letter for relief.  Section 9(3) states, in part,

> At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent.

Mass. Gen. Law ch. 93A § 9(3) (2004).

BCBSMA complied with the above statutory language, sending the requisite demand letter on October 19, 2001 through its counsel to Roger Foster, General Counsel of Mylan Laboratories, Harold Lipton, Chairman of Gyma Laboratories of America, and Peter E. Thauer, Esq., Vice President and General Counsel of Cambrex Corporation.  *See*

Exhibit A.  The letter was sent to Defendants following the FTC's investigation and the subsequent class litigations at a point in time when Defendants had entered into the settlement with the FTC, the States, and the Indirect Purchaser Class.  The BCBSMA 93A letter incorporated and contained Plaintiffs' Complaint, and fully described Defendants' unfair and deceptive practices, the injuries suffered by BCBSMA, and relief sought by BCBSMA.  The purpose of the demand letter was to comply with the provisions of  93A § 9(3), provide Defendants with additional notice of the harm caused by their unlawful acts, and to avoid extended, costly litigation.

Mylan, Gyma, and Cambrex failed to respond with a settlement offer of any kind to BCBSMA's 93A demand within 30 days (despite the fact Defendants had essentially conceded liability, causation and damages in the third party payer class cases); therefore, under Massachusetts law, they are responsible for treble, not double damages.  Chapter 93A section 9 provides:

> Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner.

Mass. Gen. Law ch. 93A § 9(3) (2004).

Not only did Mylan, Gyma, or Cambrex fail to respond to BCBSMA's demand letter within 30 days, at no time have Defendants made serious efforts to settle this case. In fact, the only settlement offer *ever* made by Defendants to Plaintiffs was an offer of judgment pursuant to F.R.Civ.P. 68 made on December 18, 2003 for a total to all the

Plaintiffs of $160,000 (with no provision for payment of attorneys' fees and costs), of which only $50,000 was offered to BCBSMA.  *See* Exhibit B.  This offer expired by its terms on January 6, 2004.  Likewise, although Defendants participated in a mediation before Magistrate Judge Facciola, they made no offer of settlement at all during or after the mediation.

Massachusetts courts award multiple damages when Defendants fail to respond to demand letters or make an unreasonable settlement offer, regardless of whether the unlawful conduct was willful.  *See Bachman v. Parkin*, 471 N.E.2d 759, 761 (Mass. App. Ct. 1984) ("If [the judge] thought a lack of willfulness in the breaches of contract excluded a multiple recovery stemming from Builder's settlement offer, he was in error, as the two matters are expressed in the disjunctive in § 9(3) and are not substantively equivalent."); *Damon v. Sun Company, Inc.*, 87 F.3d 1467, 1486 (1st Cir. 1996) (reinforcing notion that multiple damages are appropriate in 93A § 9 actions when Defendant fails to abide by procedures set forth in § 9 by failing to tender a reasonable offer of settlement, as distinguished from § 11 procedures).  Failure to respond with a reasonable settlement offer triggers multiple damages because the penalty in section 9(3) "is an attempt to promote pre-litigation settlements by making it unprofitable for the Defendant either to ignore the Plaintiff's request for relief or to bargain with Plaintiff with respect to such relief in bad faith."  *Heller,* 382 N.E.2d at 1065; *International Fidelity Insurance Co. v. Wilson*, 443 N.E.2d 1308, 1318 (Mass 1983), attached hereto as Exhibit C.

Here, the Defendants' lone settlement offer to BCBSMA of $50,000, representing less than .6% of the jury award (not including any award of fees and costs), fails to

satisfy the good faith settlement offer requirements of Chapter 93A § 9(3). Accordingly, Defendants are obligated to pay treble, as opposed to double, damages.

### 3. Defendants Are Each Liable to BCBSMA for the Punitive Portion of the Treble Damage Award.

Unlike federal antitrust law which holds that multiple Defendants are liable jointly and severally for treble damages, *see, e.g., City of Atlanta v. Chattanooga Foundry & Pipe Works,* 127 F. 23 (6th Cir. 1903), *aff'd,* 203 U.S. 390 (1906), under Massachusetts law there is no joint and several liability between Defendants for the punitive portion of the damages. *International Fidelity Insurance Co. v. Wilson*, 443 N.E.2d 1308, 1316 (Mass. 1983) ("concurrent wrongdoers are independently liable"). Instead, under Massachusetts law, each of the Defendants is liable separately for the punitive portion of the judgment.

The Supreme Judicial Court of Massachusetts has adopted the rule in 93A cases, when concurrent liability has been established and multiple damages are appropriate, that Defendants each will be subject to liability for multiple damages and the concurrent wrongdoers will not be entitled to contribution. *International Fidelity*, 443 N.E.2d 1308, 1317-18 (Mass 1983).[12]

In *International Fidelity*, plaintiff IFC argued that it was entitled to the multiple portion of the damages award against the three defendants individually. *International Fidelity,* 443 N.E.2d at 1316. The defendants countered that IFC was limited to a collective joint and several award of damages. *Id.* In a carefully reasoned opinion, the Supreme Judicial Court of Massachusetts rejected joint and several liability for multiple

---

[12] Additionally, payment by one defendant of its multiple damages penalty in full will not absolve any other defendants from their full multiple damage liability. *See Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 19 (1st Cir. 1985).

defendants exposed to multiple damage liability under 93A.  *Id.* at 1317-18.  According to the Court, the Massachusetts legislature explicitly declined to adopt language modeled after the Clayton Antitrust Act, and instead

> consciously enacted a rule whereby the defendant's liability is measured by the degree of . . . culpability . . . The multiple damages provisions of c. 93A are designed to impose a penalty that varies with the culpability of the defendant…[and] that defendants would be independently liable for multiple damages under [93A].

*Id*.  The court also explained the rationale for its holding, stating:

> The imposition of independent liability against multiple defendants will promote settlements.  Limiting the plaintiff to a single award of multiple damages would seriously compromise the goals of punishment and deterrence in cases where several defendants have participated through their own individual acts in a single wrong.
>
> That a right of contribution is not expressed in §§ 9 and 11 further supports the imposition of independent liability. First, without independent liability, the calculus of settlement for the defendant will be tipped toward litigating the matter. The price of settling will be steep because a defendant whose offer is accepted may bear a disproportionate share of the compensatory damages. The price of litigating will be slight since a defendant may avoid satisfying any judgment even if the underlying violation was willful.  Thus, without independent liability multiple defendants would be encouraged to litigate rather than to settle.
>
> Second, if there were a restriction to a single award, the actual recovery from each defendant would not be tied to the degree of each defendant's culpability.

*Id.* at 1318-19.[13]

---

[13]  In 1997, the Appeals Court of Massachusetts stated in *Saud v. Fast Forward, Inc.*, that "defendants who violated c. 93A are independently liable for the ensuing damage.  A plaintiff is not limited to a single award of multiple damages."  *Saud*, 682 N.E.2d 1363, 1365 (Mass. App. Ct. 1997) (finding multiple defendants each severally liable for multiple damages).  In 2000, the Supreme Judicial Court of Massachusetts once again noted that each individual defendant will be subject to multiple damages based upon the individual defendant's culpability.  *Kattar v. Demoulas*, 739 N.E.2d 246, 259 (Mass. 2000) (finding only one defendant's conduct reached the level of culpability triggering multiple damages).  *See also Framingham Union Hosp., Inc. v. Travelers Ins. Co.,* 774 F. Supp. 29, 34 (D.C. Mass. 1990).

In THE LAW OF CHAPTER 93A:  THE MASSACHUSETTS CONSUMER AND BUSINESS PROTECTION ACT (1989), a comprehensive treatise on the Massachusetts Consumer and Business Protection Act, Michael Gilleran explains how to apply treble damages in a 93A § 9 case involving multiple liable defendants.  His example is illustrative:

> Where three defendants combine intentionally and willfully to cause a single wrong in the amount of actual damages of $1 million, each will be jointly liable for the $1 million in actual damages, but each will be independently liable for triple damages of $2 million dollars each.  So as a result of the injury being caused by concurrent wrongdoers, instead of liability for a single award for treble damages for $3 million, there will be joint liability for a single award of compensatory damages of $1 million, and also three awards of individual liability for triple damages of $2 million for a total liability of $7 million.

Gilleran, § 11:12 at 389, attached hereto as Exhibit D; *see also* Margot Botsford,  et al., CHAPTER 93A RIGHTS AND REMEDIES, § 4.3.5 at 4-15, attached hereto as Exhibit E.

Thus, unlike federal law, under 93A, Mylan, Gyma, and Cambrex are each independently subject to liability for treble damages because the three corporations acted concurrently.  The uncontroverted evidence is that Defendants each acted concurrently to achieve their goal of colluding to eliminate competition for generic lorazepam and clorazepate.

Nor can it be said that any one of the three should be held to be less culpable. Because the jury found that all three Defendants herein liable for willful conduct, the only question for the Court is the extent to which each Defendant is liable for double or treble damages.  This is exactly what happened in *International Fidelity.*  After the jury found the defendants had acted willfully, the trial court's only decision was whether each defendant was liable for double or triple damages.  Accordingly, the court entered a judgment against one defendant (Wilson, Sr.) for double damages while it entered

judgments against the other two defendants (Wilson, Jr. and Pignato) for treble damages. 443 N.E.3d at 844, 859.  The difference between the double damages awarded against Wilson, Sr. and the other two defendants was the fact that Wilson, Sr., though he was found by the jury to have acted willfully, had largely been a passive participant.  The jury found he had not signed the disputed indemnity agreement, nor had he made the misrepresentations the other defendants made.  *Id.* at 848-49.

Unlike the passive participation of Wilson, Sr., in *International Fidelity,* all three Defendants in this case were actively complicit in the Exclusive Agreements.  Indeed, each needed the complicity of the other two for the scheme to succeed.  As Richard Stupar admitted, Mylan "wouldn't have been able to sell one tablet" without the active cooperation and agreement of Cambrex (owner of Profarmaco) and Profarmaco's U.S. agent, Gyma.  *See* Afternoon Tr., May 6, 2005 at 46:9-15.  In turn, Cambrex and Gyma needed Mylan's agreement to notify the market of the sham raw material shortages and its notification to HCFA of the elimination of FUL/MAC limits in order to establish the new retail prices levels. The role of each was necessary to the success of the scheme, and therefore each is liable independently for treble damages under Massachusetts law.

BCBSMA suffered actual damages as a result of Defendants' conduct totaling $8,430,887.  Under Chapter 93A, BCBSMA is entitled to treble damages against each Defendant, severally.  Therefore, BCBSMA respectfully requests that the Court enter judgment against Defendants in the following amounts to conform with Massachusetts law:  a) Mylan, Gyma, and Cambrex – joint and several liability for actual damages totaling $8,430,887; b) Mylan Laboratories– independent liability for treble damages totaling $16,861,774; c) Gyma Laboratories of America - independent liability for treble

damages totaling $16,861,774; and d) Cambrex Corporation - independent liability for treble damages totaling $16,861,774.

**D.     UNDER MINNESOTA ANTITRUST LAW, MINN. STAT. § 325D.57, BCBS MINNESOTA AND FEDERATED MUTUAL INSURANCE COMPANY SHALL BE AWARDED TREBLE DAMAGES.**

Consistent with the policies set forth in federal case law, the competition laws of Minnesota require this Court to treble the actual damages suffered by Plaintiffs BCBS Minnesota and Federated as a result of Defendants' anti-competitive conduct. *See* Minn. Stat. § 325D.57 (2004). Under section 325D.57, "[a]ny person … injured directly or indirectly by a violation of sections 325D.49 to 325D.66, <u>shall</u> recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees." *Id.* § 325D.57 (emphasis added).

Treble damages are mandated under Minnesota law. *See, e.g., Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 279 (Minn. 1995) (Stringer, J. dissenting) (in a Minnesota Human Rights Act case, discussing mandatory trebling of damages under Minnesota Antitrust Law by analogy, stating "[t]he treble-damage provisions of the Minnesota antitrust laws <u>do not provide the trial court with discretion</u> to determine the multiple of damages . . . .") (emphasis added); s*ee also Hoffman v. Delta Dental Plan*, 517 F. Supp. 564 (D. Minn. 1981) ("In addition, Minn. Stat. § 325D.57 provides for the recovery of treble damages by '(any) person, any governmental body, or the state of Minnesota or any of its subdivisions or agencies, injured by a violation of sections 325D.49 to 325D.66'").

The jury unanimously awarded Blue Cross Blue Shield of Minnesota ("BCBS Minnesota") damages in the amount of $1,756,096 under Minnesota's antitrust statute.

The Court is therefore required under Minnesota law to treble the jury's award to BCBS Minnesota to the amount of $5,268,288.   Moreover, the jury unanimously awarded Federated Mutual Insurance Company ("Federated") damages in the amount of $410,878 under Minnesota's antitrust statute.   The Court is therefore required to treble the jury's award to Federated to the amount of $1,232,634.

## III.  <u>CONCLUSION</u>

Treble damages are particularly compelling in this case, with unrepentant Defendants who have never expressed a moment's regret over actions that had such profound effects on the patients and parties like Plaintiffs that pay for prescription drugs, Defendants who are committed to finding a way to overcome legal limitations to increase profits by harming consumers and their health plans.   Additionally, trebling damages will serve as notice to these major players in the generic drug industry, and to the health care industry as a whole, that future anticompetitive conduct of this nature will not be overlooked nor tolerated by the U.S. court system.   Accordingly, this Court should impose the fullest possible measure of damages as the penalty in this case.

Dated:  June 17, 2005                   Respectfully submitted,

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**


By:     _____/s/_____

W. Scott Simmer (Bar No. 460726)
Kenneth A. Freeling (Bar No. 366738)
Jeffrey J. Downey (Bar No. 427010)
Thomas J. Poulin (Bar No. 475115)
Danielle Avolio
1801 K Street, N.W., Suite 1200
Washington, D.C.  20006
Tel.    202-775-0725
Fax.    202-223-8604

*Attorneys for Blue Cross Blue Shield of*
*Minnesota, Blue Cross Blue Shield of*
*Massachusetts and Federated Mutual*
*Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June 2005, the within motion and exhibits, and proposed Order were filed electronically and served via the court's electronic filing system to:


Kevin R. Sullivan
Peter M. Todaro
King & Spalding, LLP
1730 Pennsylvania Ave., NW
Washington, DC 20006
krsullivan@kslaw.com
ptodaro@kslaw.com

*Attorneys for the Defendants*


_____/s/_____
W. Scott Simmer