**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **IN RE LORAZEPAM & CLORAZEPATE** ) | |
| **ANTITRUST LITIGATION** ) | |
| _____ ) | **MDL No. 1290** |
| ) | **Misc. No.  99-MC-0276** |
| **This Opinion applies to:** ) | |
| ) | |
| **All Actions** ) | |
| _____ ) | |

### MEMORANDUM OPINION

Pending before the Court are several motions.  Blue Cross Blue Shield of Massachusetts ("BCBS-MA"), Blue Cross Blue Shield of Minnesota ("BCBS-MN"), Federated Mutual Insurance Company ("Federated"), and Health Care Service Corporation ("HCSC") (collectively "Plaintiffs") move the Court to treble damages [Docket Nos. 887 & 891]; Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc., Cambrex Corporation, and Gyma Laboratories ("Defendants") move for remittitur under Rule 59(e) [Docket No. 890]; and Defendants move the Court to dismiss Blue Cross Blue Shield of Minnesota and Federated Insurance Company [Docket No. 910].  Upon careful review of the motions, oppositions, replies, and the entire record, the Court will DENY Defendants' motion to dismiss [Docket No. 910], GRANT in part and DENY in part Defendants' remittitur motion [Docket No. 890], and GRANT Plaintiffs' trebling motions [Docket Nos. 887 & 891].

## I.     BACKGROUND[1]

On June 1, 2005, after a jury trial lasting over three weeks, the jury found for the

Plaintiffs and against all Defendants on the following state law claims:[2]  agreement in

unreasonable restraint of trade, conspiracy in unreasonable restraint of trade, monopolization, and

attempted monopolization, all in the Lorazepam active pharmaceutical ingredient ("API") market

and the Lorazepam tablet market and in the Clorazepate API and tablet markets.[3]  The jury

awarded Plaintiff Blue Cross Blue Shield of Minnesota $1,756,096.00, Plaintiff Blue Cross Blue

Shield of Massachusetts $8,430,887.00, Plaintiff Federated Mutual Insurance Company

$410,878.00, and Plaintiff Health Care Service Corporation ("HCSC") $1,448,437.00 in

damages.

At the center of this litigation are exclusive licensing agreements among Defendants.  In

November 1997, Mylan and Profarmco, a wholly owned subsidiary of Cambrex, entered two

agreements, each entitled "Exclusive Agreement," in which Profarmco agreed to supply its

Lorazepam and Clorazepate API to Mylan in exchange for an upfront payment and a share of

Mylan's profits from the sale of the two drugs in the form of royalty payments.  The Exclusive

Agreements had a term of ten years and provided that Profarmco would not supply Lorazepam

and Clorazepate API to any other generic manufacturers in the United States, but the agreements

did not prohibit such sale to the branded manufacturers or to any manufacturer outside of the

---

[1]  For a detailed account of this case's extensive procedural history see the following
opinions: 289 F.3d 98 (D.C. Cir. 2002); March 30, 2005 Mem. Op. ("S.J. Mem. Op.") [Docket
No. 785]; 295 F. Supp. 2d 30 (D.D.C. 2003); 202 F.R.D. 12 (D.D.C. 2001).

[2]  The claims were brought under the antitrust laws of Massachusetts, Minnesota, and
Illinois.

[3]  Lorazepam and Clorazepate are generic prescription anti-anxiety drugs (the generic
equivalents of Ativan® and Tranxene®, respectively).

United States.  The Exclusive Agreements did, however, provide that Profarmco should take all steps reasonably necessary to prevent the Lorazepam and Clorazepate API it sold outside the United States from entering the United States.  The Exclusive Agreements were terminated in December 1998 after the Federal Trade Commission ("FTC") announced its investigation of Mylan's actions.  The FTC subsequently entered into a $100 million settlement with Mylan.

## II.    PARTIES

Plaintiffs BCBS-MA, BCBS-MN, Federated, and HCSC are health insurance companies that are third-party payors for prescription drugs, including Lorazepam and Clorazepate, on behalf of their insureds and self-funded customers, typically employer-sponsored health plans that contract with Plaintiffs to administer claims on their behalf and pursue plan-related costs. Defendant Mylan is a large generic drug manufacturer and distributor that markets at least 91 generic drugs, including Lorazepam and Clorazepate.  Defendant Cambrex sells chemicals through its subsidiaries for, among other things, drug manufacture.  Defendant Profarmco is a wholly-owned subsidiary of Cambrex that manufactures and sells various APIs.  Defendant Gyma sells APIs and other chemicals to the pharmaceutical industry.  Gyma acts as a U.S. agent for Profarmco, buying various APIs from Profarmco and selling them to generic manufacturers in the United States.  Prior to the agreements at issue, Profarmco and Gyma sold Lorazepam and Clorazepate API to Mylan and its generic competitors.

The Court will dispose of Defendants' motion to dismiss and remittitur motion before turning to Plaintiffs' motions for treble damages.

### III.   Motion to Dismiss

On August 22, 2006, the Minnesota Court of Appeals affirmed a lower court's judgment on the pleadings that the plaintiff in an antitrust suit lacked standing.  *Lorix v. Crompton Corp.*, 720 N.W.2d 15 (Minn. Ct. App. 2006) ("*Lorix I*").  Relying on *Lorix I*, Defendants filed a 12(b)(1) Motion to Dismiss on September 19, 2006 [Docket No. 910].  On August 2, 2007, the Minnesota Supreme Court reversed the appellate court.  *Lorix v. Crompton Corp.*, 736 N.W.2d 619 (Minn. Aug. 2, 2007) ("*Lorix II*").  Prior to the Minnesota Supreme Court's decision, Defendants argued *Lorix I* "clarifie[d]" existing Minnesota case law and compelled the Court to dismiss Plaintiffs BCBS-MN and Federated based on lack of standing.  Following *Lorix II*, Defendants argue the Minnesota Supreme Court's recognition that standing is not limitless supports their motion to dismiss.  Because the Plaintiffs were buyers from, and the customers of, Defendants regardless of whether they paid for the drugs through an intermediary, they were participants in the market constrained and, consequently, are well within the outer limits of Minnesota antitrust standing.  Accordingly, the Court will deny Defendants' motion to dismiss.

### A.   Background

Minnesota law confers antitrust standing to "[a]ny person . . . injured directly or indirectly" by state antitrust violations.  Minn. Stat. § 325D.57 (2004).  Prior to trial, the Court considered and denied Defendants' argument that BCBS-MN and Federated lacked standing under § 325D.57 and the relevant case law.  *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30 (D.D.C. 2003).  Relying on *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490 (Minn. 1996), this Court concluded: "[i]n sum, the Minnesota Supreme Court has concluded that third party payor health services organizations possess the general right to sue in antitrust under Section 325D.57 of the Minnesota Antitrust Law."  *Lorazepam*, 295 F. Supp. 2d at 35

(citing *Humphrey*, 551 N.W.2d at 495-96).  Indeed, the Minnesota Supreme Court in *Humphrey* indicated that, even absent statutory authority, BCBS-MN would likely have standing because that court found persuasive Judge Posner's reasoning in *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) (holding that Blue Cross Wisconsin had standing to sue in antitrust as a direct purchaser, even though each payment was made on behalf of individual patients).  *Humphrey*, 551 N.W.2d at 497 n.1.  Finally, this Court adopted the rationale from *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), in holding that plaintiffs are buyers from and customers of defendants, despite the fact that plaintiffs did not deal directly with defendants.  *Lorazepam*, 295 F. Supp. 2d at 40.

Notwithstanding the Court's prior decision, Defendants urge this Court to reexamine Plaintiffs' standing with the aid of the *Lorix* decisions.[4]  Relying on *Lorix I*, Defendants argued that despite the  broad language of § 325D.57, standing for those injured "indirectly" is limited to only those who were injured indirectly *and* were participants in the market constrained. Defendants' Reply 3.  Because Plaintiffs were not market participants, Defendants continued, they lacked standing.  *Id*.  On August 2, 2007, the Minnesota Supreme Court reversed the lower court, specifically declining to impose a market participant requirement.  *Lorix*, 736 N.W.2d at 629 ("The two federal appellate decisions cited by the court of appeals do not compel us to impose a market-participant requirement.").  Notwithstanding its holding that indirect purchasers

---

[4]  In *Lorix*, the plaintiff asserted respondents conspired to fix the price of rubber processing chemicals that are sold for and used in the manufacture of automobile tires.  *Lorix*, 720 N.W.2d at 16.  The plaintiff did not allege that she purchased any over-priced chemicals but that she purchased tires manufactured using the over-priced chemicals and the manufacturer passed the additional cost on to her.  *Id*.  The Appeals Court affirmed, finding the reach of section 325D.57 not so broad as to capture plaintiff's claims because Lorix – a mere purchaser of automobile tires – was not a participant in the market constrained.  Minn. Stat. § 325D.57 (2004), *Lorix*, 720 N.W.2d at 19.

need not be market participants to have standing, the court acknowledged that "there are injuries so remotely related to antitrust violations that courts simply cannot provide relief." *Id.* at 19. Before declining to define the outer limits of antitrust standing, the court noted that such a definition must be "informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law; otherwise, almost any antitrust violation would provide almost any citizen with a cause of action arising from the resulting ripples of harm throughout the state's economy." *Id.*  Faced with the Minnesota Supreme Court's decision, Defendants pivot slightly from their earlier position and argue instead that they are situated precisely as the court suggested  some defendants may be; specifically, their "injury is most likely too remote and speculative to afford standing."  Reply at 2 (citing *Lorix,* 736 N.W.2d at 629).

### B.   Discussion

In 2003, the Court squarely addressed the core of Defendants' instant 12(b)(1) Motion – that antitrust injury requires the plaintiff to suffer its injury in the market where competition is constrained – and found Plaintiffs suffered their injury in the requisite market.  *Lorazepam*, 295 F. Supp. 2d at 38-39.  The Court noted that, while it is true that "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained," it is also true that "the Supreme Court has carved a narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants."  *Id.* (citing *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057, 1057 n.5 (9th Cir. 1999)).  The Court found BCBS-MN and Federated were so situated.  *Id.*

The facts in the instant case are similar to those in *Desiano v. Warner Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), and the Court explained and expressly adopted the following rationale from *Desiano* in its 2003 Opinion:

> Although this court has not to date held that insurance companies are, in all instances, the "purchasers" of the drugs for which they reimburse pharmacies, we, like several other courts, have indicated that in a variety of contexts they are the buyers. See, e.g., Med. Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Conn., Inc., 675 F.2d 502, 505 (2d Cir. 1982) ("[T]he Pharmacy Agreements . . . are merely arrangements for the purchase of goods and services by Blue Shield.") (quoting Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 214 (1979)); Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 65 F.3d 1406, 1414 (7th Cir.1995) (holding that insurance companies had standing, as the "direct purchaser[s]," to maintain an antitrust suit). Moreover, and more directly relevant to this case, perhaps, Plaintiffs point out that this and other courts have long recognized the right of HBPs to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices. See, e.g., Hartford Hosp. v. Chas. Pfizer & Co., 52 F.R.D. 131, 133 (S.D.N.Y. 1971) (approving $10 million class action settlement of antitrust claims brought by insurance plans against drug companies).

Id. at 350-51. As the Court noted in 2003, "[a]lthough the physician prescribes, the pharmacist dispenses, and the patient takes the medication, in most cases, *it is the insurer such as Plaintiffs who actually pay*." *Lorazepam*, 295 F. Supp. 2d at 40. Accordingly, the Court found Plaintiffs were Defendants' customers "and as such are the entities chiefly harmed by Defendants' alleged anticompetitive conduct." *Id.*

The *Lorix* decisions do not affect the appropriateness of the Court's 2003 analysis. Unlike the plaintiff in *Lorix* who purchased automobile tires from a company that, in turn, dealt directly with and purchased from the companies allegedly engaged in anti-competitive behavior, the Plaintiffs in the instant matter were direct "customers" of Defendants even though they did not pay the Defendants directly. As this Court stated, "what is important is not whether Plaintiffs have entered into a written purchase agreement with Defendants, but whether Plaintiffs were buyers from and 'customers' of Defendants." *Id.*

In sum, what the Court found in 2003 remains true today—i.e. Plaintiffs were the buyers from and customers of Defendants regardless of whether they paid for the drugs through an intermediary. Because Plaintiffs were buyers from Defendants, they were participants in the

relevant market constrained and were *not*, as Defendants maintain, further removed from the market than Lorix.  The injuries were certainly not too remote or speculative to afford standing.  As market participants, whatever the outer limits of Minnesota antitrust standing for indirect purchasers may be, Plaintiffs are less tangentially related than Lorix, and *Lorix*, according to the Minnesota Supreme Court, "falls well within [the outer limits]."  *Lorix*, 736 N.W.2d at 631.  Accordingly, the Court will deny Defendants' motion to dismiss.

## IV.   Remittitur Motion

### A.   Availability of Remittitur

As a threshold matter, Plaintiffs posit that Defendants' remittitur motion is, in substance, a motion for reconsideration.  Opp'n 1-2.  Motions for reconsideration may be granted based on an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice.  *See Anyanwutaku v. Moore*, 151 F.3d 1053, 1057-1058 (D.C. Cir. 1998).  Because Defendants have not shown clear error, a change in controlling law, or new evidence, Plaintiffs argue the motion must fail.[5]  *Id*. at 2.  Plaintiffs' effort to characterize Defendants' motion as one for reconsideration fails, however, because the "prior rulings" to which Plaintiffs refer were contained in the Court's summary judgment opinion.  That opinion necessarily considered whether Defendants were entitled to judgment as a matter of law.  Defendants correctly note that the Court has yet to rule on whether the jury's award is supported by the evidence.  Def. Reply 3.  Accordingly, the motion is available to Defendants.

---

[5]  Plaintiffs also argue the award does not rise to a level that "shocks the conscience" and remittitur is therefore inappropriate.  Opp'n 4-6.  While it is true that an award may be reduced if it is excessive or shocks the conscience, that is not the only circumstance where remittitur may be appropriate, and it is not what Defendants argue here.  Rather, Defendants argue that certain identifiable sums were impermissibly included and therefore should be excluded as a matter of law.

### B.     Background

Defendants submit certain sums were erroneously included in the award and move the Court to correct it in two respects: "the damages must be limited in duration and Plaintiffs should not be permitted to recover on behalf of their self funded customers." Def. Reply 2.  Plaintiffs oppose the motion but concede the award should be reduced by a total of $76,266.00 for Plaintiff BCBS-MA and $1,058.00 for Plaintiff BCBS-MN to reflect the five self-funded plans that elected to be excluded from the litigation.  Pl. Opp'n 17-18.  With the exception of the self-funded plans that opted out of the litigation, Defendants fail to establish that the damage award included impermissible components as a matter of law.  Accordingly, the Court will grant in part and deny in part Defendants' motion for remittitur.

Pursuant to Fed. R. Civ. P. 59(e), "except when 'it is apparent as a matter of law that certain identifiable sums were included in the verdict that should not have been there,' a trial judge should not unconditionally reduce the amount of damages awarded by verdict, for to do so impermissibly encroaches on the litigants' constitutional right to a jury." *Carter v. District of Columbia,* 795 F.2d 116, 134 (D.C. Cir. 1986) (quoting 11 Charles Alan Wright and A. Miller, *Federal Practice and Procedure,* § 2815).  In *Carter,* the circuit court reversed the trial court's decision to excise $40,000 from the award as an "identifiable sum." *Id*.  Our circuit concluded that "[u]nless . . . damages include[d] an impermissible component that can be identified and calculated with precision . . . it is not the district court's prerogative to enter a remittitur by fiat." *Id.* at 135.  Rather, if the district court believes a reduction in the award is appropriate, it should "pose to plaintiffs the choice between consent to the reduction and a new trial." *Id*.  For the reasons that follow, the Court concludes that no portion of the award was included in error, save the self-funded plans that opted out of the litigation.  Therefore, with the exception of those self-

funded plans, the award stands.

### C.    Duration of Damages Period

With respect to duration, Defendants urge the Court to adopt one of three alternatives: (1) reduce the award to reflect damages through only the "early foreclosure period," which ended in March, 1998, thus limiting damages to a total of $188,162; (2) reduce the award to reflect damages through only the end of 1998, thus limiting damages to a total of roughly $1.6 million; or (3) reduce the award to include damages through only the fourth quarter of 2000 for Lorazepam and the first quarter of 2002 for Clorazepate (i.e., the time frame within which Defendants assert prices returned to the pre-increase price level), thus limiting damages to roughly $7.1 million.

### 1.    Early Foreclosure Period

Defendants argue that by March, 1998, "Lederle and Geneva had entered the Lorazepam market, making restraint on Purepac or Watson inconsequential." Remittitur Mot. 3. And "[s]imlarly for Clorazepate, any restraint on Watson was removed by its May 1998 authorized generic contract with Abbot." *Id*. Therefore, Defendants submit damages ended with the entrance of competitors into the marketplace, and any portion of the award attributable to the time period beyond March, 1998, is an identifiable sum the jury erroneously included. This argument fails.

As Plaintiffs correctly note, Defendants' "early foreclosure" argument does not recognize that the competitors who entered the market in March, 1998, did so at approximately a 3000% increase. Pl. Opp'n 7. Even though the exclusivity agreements ended in March, 1998, it does not follow that damages ceased contemporaneously. As the Court noted in 2005, "Defendants' focus on the duration of the exclusive agreement is misplaced. The relevant analysis is as to the

duration of the effects of the agreements on the relevant markets, not simply the exclusive term of the agreements themselves." S.J. Mem. Op. 22 [Docket No. 785].

Because Defendants do not meet their burden of establishing that the damages must be limited to the duration of the exclusive agreements as a matter of law, granting remittitur with respect to damages attributable to only the "early foreclosure period" is inappropriate.

### 2.   Damages Through 1998

Alternatively, Defendants urge that any damages attributable to the time period beyond 1998 should not have been included in the award as a matter of law and that the Court should adjust the award accordingly.   Again, Defendants argue that competitors had "unfettered access to Profarmco API, as well as API from other manufacturers" by 1998 and, therefore, any damages claimed by Plaintiffs after 1998 should have been excluded as a matter of law.  This argument fails for the same reason as Defendants' first argument.  Specifically, it is the effect of the antitrust behavior that is dispositive, not the duration of the agreements.  And the jury clearly concluded that the effect of the agreements extended beyond their duration.  Liability, therefore, lies there as well.

### 3.   Damages After Prices Returned to Pre-Increase Levels

As a third alternative, Defendants move the Court to find that any portion of the award attributable to the time period after the price returned to pre-increase levels was erroneously included and should be excluded as a matter of law.  This argument falls short as well.

The Court noted in its summary judgment opinion [Docket No. 785] that "Plaintiffs have provided evidence that the agreements negatively impacted competition in the market long after the agreements' termination, affecting pricing even today."  S.J. Mem. Op. 22 (March 31, 2005) (citing Saha Rep. at 35-36).  As the Court pointed out, "[t]he assessment of long term effects

depends greatly on credibility of the evidence, which is the task of the jury." *Id*. (quoting *Geneva Pharms. Techn. Corp. v. Barr Labs., Inc*. 386 F.3d 485, 510 (2nd Cir. 2004). The Court permitted the jury to perform its function, part of which was to decide the duration of the long term effects of the restraint of trade claims. Defendants have not shown that the jury was in error to conclude the duration continued beyond quarter four of 2000 for Lorazepam and the first quarter of 2002 for Clorazepate. Accordingly, remittitur is inappropriate with respect to this duration as well.

> ### D. Self-Funded Customers

Defendants maintain that Plaintiffs did not have authority to pursue the claims of their self-funded customers and that the ratification procedure was never approved by the Court. They are incorrect.

> #### 1. Background

On March 2, 2005, the Court determined that "Plaintiffs lack authority to bring claims on behalf of their self funded customers." March 2, 2005, Order [Docket No. 745]. One week later, Plaintiffs moved the Court to reconsider its decision or, alternatively, to permit Plaintiffs to seek the authority through a ratification process pursuant to Fed. R. Civ. P. 17 [Docket No. 762]. On April 19, Plaintiffs submitted a report on the ratification process they had undertaken. On April 25, the Court denied the motion for reconsideration but granted the motion for leave to pursue the ratification process. April 25, 2005, Mem. Op. at 6. Specifically, Plaintiffs sought, and the Court approved, an "opt out" process, a procedure similar to that which the court approved in *In Re Cardizem CD Antitrust Litigation*, Law. No. 99-md-1278, MDL No. 1278 (E.D. Mich. June, 27, 2003) (Edmunds, J.).

### 2.    Discussion

Defendants submit that the ratification process was inadequate and, by initiating the ratification process prior to receiving Court approval to do so, the letters sent to the self-funded plans misled the plans into believing the Court had already granted Plaintiffs authority to seek ratification.[6]  Plaintiffs respond by correctly noting that the Court already ruled on Defendants' challenge of the ratification process and Defendants' motion is in substance, therefore, one for reconsideration.  Pl. Reply 8-9.  Accordingly, to prevail Defendants must show (1) an intervening change in controlling law, (2) new evidence, or (3) a need to correct a clear error to prevent a manifest injustice.  *Anyanwutaku*, 151 F.3d at 1057-58.  Defendants make no such showing.  Because Defendants in effect move the Court to reconsider its judgment with respect to the ratification process, and because Defendants have not shown (1) an intervening change in controlling law, (2) new evidence, or (3) a need to correct a clear error to prevent a manifest injustice, the Court will deny Defendants' motion with respect to the self-funded plans.

### E.    Self-Funded Plans That Opted Out Of Litigation

Plaintiffs concede that remittitur is appropriate with respect to five self-funded plans that opted out of the litigation.  Because these plans opted out, they were "impermissible component[s]" of the damage award that "can be identified and calculated with precision."  *Carter*, 795 F.2d at135.  The Court, therefore, will reduce the award by a total of $76,266.00 for Plaintiff BCBS-MA and $1,058.00 for Plaintiff BCBS-MN.  Accordingly, BCBS-MA's award is

---

[6]  In addition, Defendants argue the ratification process was inadequate because it did not meet the notice requirements in the class action context.  Opp'n 8-9.  Defendants' argument is misplaced.  In this context, the ratification process is governed by Fed. R. Civ. P. 17(a) and not Fed. R. Civ. P. 23.  As the Court held when it considered Defendants' challenge in 2005, "the application of the Remedial provision of Rule 17(a) is appropriate here if the requirements of the rule are otherwise met."  April 25, 2005, Mem. Op. at 3.

reduced from $8,430,887.00 to $8,354,621.00 and BCBS-MN's award is reduced from $1,756,096.00 to $1,755,038.00.

## IV.    Trebling Motions

### A.    Blue Cross Blue Shield of Massachusetts

Following trial, the jury awarded BCBS-MA $8,430,887.00 in compensatory damages. BCBS-MA now moves the Court to treble damages.  In addition, Plaintiff argues the compensatory award should be jointly and severally recoverable, while the punitive damages should be recoverable independently.  Accordingly, BCBS-MA moves the Court for the following award: (a) Mylan, Gyma, and Cambrex – joint and several liability for compensatory damages in the amount of $8,430,887.00; (b) Mylan Laboratories – independent liability for punitive damages in the amount of $16,861,774.00; (c) Gyma – independent liability for punitive damages in the amount of $16,861,774.00; and (d) Cambrex - independent liability for punitive damages in the amount of $16,861,774.00.  Pl. Mot. Treble Damages 22-23.  For the reasons that follow, the Court finds Defendants acted willfully and awards BCBS-MA treble damages.  In addition, in accordance with Massachusetts' law, the punitive portion of the award is recoverable independently.  Accordingly, after adjusting compensatory damages to reflect the $76,266.00 reduction discussed *supra*: (a) Mylan, Gyma, and Cambrex are jointly and severally liable for compensatory damages in the amount of $8,354,621.00; (b) Mylan Laboratories is independently liable for punitive damages in the amount of $16,709,242.00; (c) Gyma is independently liable for punitive damages in the amount of $16,709,242.00; and, (d) Cambrex is independently liable for punitive damages in the amount of $16,709,242.00.

### 1.      Multiple Damages

Under Massachusetts law, double or treble damages are statutorily proscribed if the Court finds either: (a) the violation was willful or knowing; or (b) the defendant failed to grant relief after receiving a demand letter, and such refusal was made in bad faith with knowledge or reason to know that the actions complained of violated section two.[7]   The Court will consider the chapter 93A demand letter before turning to willfulness.

### a.      Chapter 93A Demand Letter

The Court must award double or treble damages if the Defendant refused to grant relief upon demand and such refusal was "in bad faith with knowledge or reason to know that the act or practice complained of violated said section two." Mass. Gen. Laws ch. 93A, § 9(3).  As directed by statute, BCBS-MA sent a written demand letter to Defendants on October 19, 2001.  Because Defendants failed to respond to the demand letter, BCBS-MA argues § 9(3) mandates the imposition of multiple damages.

Pursuant to Fed. R. Civ. P. 68, on December 18, 2001, Defendants made a settlement offer of  $160,000, of which $50,000 was offered to BCBS-MA.  *Id*. at 18.  Because $50,000 represents only .6% of the jury award, BCBS-MA argues the offer "fails to satisfy the good faith settlement offer requirements of chapter 93A § 9(3).  Accordingly, Defendants are obligated to pay treble, as opposed to double, damages." *Id*. at 18-19.  This is an inaccurate description of chapter 93A's damages provision and its application here.

---

[7]  The statute reads in relevant part: "[i]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two."  Mass. Gen. Laws ch. 93A, §9(3).

BCBS-MA contends Defendants are subject to multiple damages "because they failed to make *reasonable* settlement offers to BCBS-MA, ignoring the opportunity to limit their exposure to multiple damages." *Id*. at 16 (emphasis added).  The statute, however, does not impose the sanction of multiple damages for failure to make a *reasonable* settlement offer, but rather, for failure to respond to the demand letter *in bad faith*.  Though the Plaintiffs may view a $50,000 settlement offer as unreasonable, it is not, in and of itself, evidence of bad faith.[8]  The Court finds there is insufficient evidence of bad faith—based on the demand letter alone—to support such a finding.

### b.    West Virginia Malpractice Litigation

In addition to the demand letter, BCBS-MA contends that Mylan made certain statements during a hearing in the Northern District of West Virginia that (1) make clear Mylan took a "diametrically different" legal position in the West Virginia matter than they take here and therefore they should be estopped from arguing Plaintiffs are not entitled to treble damages, (2) bear on Defendants' willfulness, and (3) demonstrate Defendants acted in bad faith when they failed to respond to Plaintiffs' demand letter.  *Id*. at 6.  None of these arguments persuade the Court.

Citing the transcript from *Mylan Pharmaceuticals, Inc. v. Clifford Chance US LLP*, Civ. Action No. 1:03 CV 16 (N.D.W.Va.) ("malpractice litigation"), BCBS-MA contends Mylan "admitted in open court it knew as early as 2000 that it had in fact violated the antitrust laws."

---

[8]  Moreover, BCBS-MA argues that, because Defendants failed to respond to the demand letter, "under Massachusetts law, they are responsible for treble, not double damages."  *Id*. at 17. BCBS-MA's characterization of the statute implies that a finding of bad faith shifts the damages award from double to treble damages.  It does not.  A finding of bad faith has the same effect as a willfulness finding.  Specifically, such a finding shifts the damages award from compensatory to *either* double or treble damages.  Upon such a finding, whether to award double or treble damages is in the Court's discretion.

Supp. Mot. Treble Damages 2.   Despite Plaintiffs' suggestions to the contrary, however, Mylan

took the position the case was never winnable, not that it knew it had violated antitrust laws.

During a *Daubert* hearing on August 17, 2006, the court queried Mylan regarding the

theory of liability, summarized by these exchanges:

> THE COURT: . . . then it appeared that the case was changing to we could've –
> liability was clear and we should have settled sooner and we ended up spending more
> money on the settlement then we ought to have . . .
>
> MR. BROWNE: Yes, Your Honor . . . We still are maintaining, Your Honor, the
> position that the case should have been won and would have been won and right now
> the post-trial motion are still pending in front of the HDSC [sic] case.  They have
> been before Judge Hogan for more than the year and it is our position that the case
> is imminently winnable in the – either by post-trial motions or [in] a court of appeal,
> so that part is not – that part has not been changed at all.
>           . . .
>
> THE COURT: So the theory of the case is, we were always exposed.  We never had
> a good legal defense, but we were never so advised so we spent a year and a half on
> fees . . .
>
> MR. BROWNE: Absolutely . . .
>           . . .
>
> THE COURT: All right.  So the theory of the case then is, not we could have won the
> case but because the case had massive problems in it from the beginning, the law
> firm failed to disclose that to us. . . .
>
> MR. BROWNE: Yes, and one other thing, Your Honor, if the case had been settled
> a year earlier, a year and a half earlier, late '98 or early '99, we could have saved
> close to a hundred million dollars in – in damages in the sense that no future damages
> were asked for . . .

*Id*. at 3-4.  In support of its malpractice theory, Mylan proffered the testimony of an antitrust trial

attorney, Max Blecher.  *Id*.  Based on statements made by Mylan's counsel at an earlier hearing,

the substance of Mr. Blecher's testimony was to be that Clifford Chance committed malpractice

because the reasons they relied on when they advised Defendants to settle in 2000, also existed in

late 1998 and early 1999.  *Id*.  Therefore, BCBS-MA argues, Clifford Chance knew the case was

never winnable as early as latter part of 1998.  And Defendants knew the case was never

winnable in 2000 when Clifford Chance finally advised them as much.

### i.    Estoppel

BCBS-MA argues Mylan's position in the malpractice action is "diametrically different"

from its position in this case, and therefore Defendants should be estopped from opposing treble

damages.  This argument fails.  Courts consider several factors when analyzing whether to apply

the doctrine of estoppel, including whether: (1) the earlier position was "clearly inconsistent"

with the party's current position; (2) the party succeeded in persuading a court to accept the

contrary position in an earlier proceeding, thus threatening judicial integrity; and (3) the party

seeking estoppel was unfairly prejudiced.  *New Hampshire v. Maine*, 532 U.S. 742, 750-51

(2001).  Though the Court in *New Hampshire* noted that these are only factors and not strict or

inflexible prerequisites, none of the factors cut in favor of applying the doctrine here.  *Id*.

First, the positions are not "clearly inconsistent."  Submitting to the court the case was

"unwinnable" is far different from submitting that Defendants "knew" it had violated antitrust

law.  Second, as Defendants point out, because the malpractice litigation settled, Mylan did not

succeed in persuading the court of anything and, thus, judicial integrity is not threatened.  Finally,

BCBS-MA cannot demonstrate that it detrimentally relied on Mylan's representations in the

malpractice litigation.  Because BCBS-MA cannot show that any of the *New Hampshire* factors

fall in their favor, this argument fails.

### ii.    Willfulness

Plaintiffs also argue the exchange with West Virginia court evidences Defendants'

willfulness.  It does not.  Plaintiffs submit that "Defendants' defiant position here that they had

not done anything at all wrong, while Mylan represented in open court in the West Virginia

Action that their case was never winnable, points out exactly why an award of treble damages is appropriate." *Id*. at 7.  Other than this conclusory statement and the accusation that Defendants are bad actors generally, BCBS-MA provides little as to exactly how the malpractice litigation bears on willfulness.  Again, Defendants' representation in the malpractice litigation that they were legally exposed and the case was unwinnable is not an admission.   Accordingly, the Court fails to see how the statements bear on willfulness.

### iii.   Bad Faith

In the malpractice litigation, Mylan took the position that Clifford Chance committed malpractice by not advising Mylan to settle until 2000.  By implication, Mylan was in possession of Clifford Chance's opinion letter stating the case was "unwinnable" when it received BCBS-MA's chapter 93A demand letter on October 19, 2001.  Therefore, Plaintiffs submit Mylan's refusal was in bad faith and a violation of § 9(3) because it "had reason to know its acts violated section two."

Defendant submits that it acted in good faith because it had already "offered a settlement to the indirect purchaser class, including BCBS-MA, which this Court found to be 'fair, adequate, and reasonable' when compared to the strength of the plaintiff's cases."  Def. Opp'n Supp. 3 (quoting *In re Lorazepam & Clorazepate Antitrust Litig*., 205 F.R.D. 369, 398 (D.D.C. 2002).  Defendant is correct.

In essence, Plaintiffs argue that even though they were offered—but opted out of—a settlement pursuant to the indirect purchaser class action, they complied with the Massachusetts statute by filing a chapter 93A demand letter.  Because Defendants did not respond specifically to the demand letter (and, by virtue of the Clifford Chance opinion letter, did so with knowledge their actions violated section two), Defendants are subject to multiple damages.  As Defendants

correctly point out, if the statute operated in this way and their settlement offer pursuant to the indirect purchaser class action did not protect them from an attack pursuant to chapter 93A, then they would find themselves "in the untenable position of settling a class action only to be required to offer more in settlement to any opt-outs in order to avoid an automatic award of multiple damages." Def. Opp'n 16.  The statute cannot operate in this way.  Accordingly, the Court finds the malpractice litigation does not support a finding of bad faith on behalf of Defendants.

### c.      Willfulness

Notwithstanding the Court's finding that Defendants' refusal to grant relief upon demand was not bad faith under Massachusetts law, Defendants are subject to multiple damages if the Court finds the violation willful or knowing.  Mass. Gen. Laws ch. 93A, § 9(3).

A "willful or knowing" violation in this context "cannot be grounded upon a negligent act," *Whelihan v. Markowski*, 638 N.E.2d 927, 929 (Mass. App. Ct. 1994), or "relatively innocent violations of the statute's substantive provisions." *Int'l Fidelity Ins. Co. v. Wilson*, 443 N.E.2d 1308, 1316 (Mass. 1983).  Nor, however, does a "willful or knowing" finding require the high bar of specific intent as Defendants suggest.  Def. Opp'n 1.  Rather, "[t]he 'willful or knowing' requirement . . . goes not to actual knowledge of the terms of the statute, but rather to knowledge, or reckless disregard, of [conduct] . . . which, whether the defendant knows it or not, amount[s] to violations of the law." *Montanez v. Bagg*, 510 N.E.2d 298, 300 (Mass. App. Ct. 1987); see also *Kattar v. Demoulas*, 739 N.E.2d 246, 259 (Mass. 2000) ("finding of 'wilful' conduct within the meaning of c. 93A (1994 ed.) is satisfied where the defendant has acted recklessly."), *Still v. Commissioner of the Dep't of Employment & Training*, 672 N.E.2d 105, 112 (Mass. 1996) ("decisions construing the multiple damages provisions of G.L. c. 93A have

imposed such damages for 'wilful' or 'knowing' violations, equating the former with reckless conduct and the latter with intentional acts"). For the reasons that follow, the Court finds Defendants willfully violated chapter 93A and the degree of such willfulness was sufficient to merit treble damages.

First, the jury found "Plaintiffs prove[d] by a preponderance of the evidence that Defendants' violations of the antitrust laws were willful." Verdict Form at 5. Even though the jury's finding does not automatically compel a multiple damages award,[9] it certainly weighs heavily in favor of such a finding, particularly considering its strong evidentiary basis.

Second, Defendants hatched a scheme specifically designed to impede competition. By entering into the "Exclusive Agreements," Defendants endeavored to control the market by severing competitors' access to the requisite chemicals. Afternoon Tr., May 6, 2005 at 97:4-14 ("[t]he purpose of the exclusive agreement was not to give the product to the other two [competitors]"; *see also* PEX 5105, Puskar Tr. at 51 (admitting the purpose of the agreements was to cut off the supply of Profarmco to Mylan's competitors)). In addition, the terms of the Exclusive Agreements themselves make clear Defendants' intent. Mylan agreed to make large upfront payments, as well as to pay Gyma and Cambrex/Profarmco a 15% "royalty" in exchange for exclusivity. Such an arrangement is nonsensical, absent a recognition that Defendants' intent

---

[9] Relying on *Wang Labs., Inc. v. Bus. Incentives, Inc.*, 501 N.E.2d 1163, 1166-67 (Mass. 1986), BCBS-MA contends that the jury's willfulness finding *compels* the Court to award multiple damages. Pl's Mot. for Treble Damages 15. In *Wang*, the *court* found Defendant's actions were willful, and it then failed to impose double or treble damages. *Id.* The Supreme Judicial Court concluded that because the trial court made the requisite willfulness finding, multiple damages were demanded by operation of law. *Id.* It was not the case, as here, that the *jury* found Defendant's actions willful, but the court then failed to award multiple damages. In sum, while it is true that to avoid the imposition of multiple damages the Court would have to find the jury's willfulness finding without evidentiary basis—a high bar Defendants cannot meet—the Court is not *compelled* to award multiple damages based solely on the jury's finding.

was to cut off supply from competitors, increase the prices substantially above competitive levels after the agreements took effect, and then divide the profits generated.  Such conduct is precisely the type antitrust law is designed to combat.  Morever, while it was Mylan that first conceived the plan, Gyma and Cambrex/Profarmco were not passive participants, and accordingly, are no less culpable.  The plan came to fruition only through the active participation of all three defendants.  All three recognized the profitability of the exclusivity agreements and actively negotiated the terms.  And all three reaped the rather substantial windfall.

In short, Defendants' concerted efforts—with clear antitrust objectives—were not "relatively innocent violations of the statute's substantive provisions" that might escape multiple damages.  *Int'l Fidelity*, 443 N.E.2d at 1316.  To the contrary, Defendants' conduct evidences intent carefully designed to reach ends that amount to violations of the law, "whether the defendant[s] [knew] it or not."  *Montanez*, 510 N.E.2d at 300.  Accordingly, in the Court's carefully considered judgment, Defendants' conduct falls well within what is required to find a "willful or knowing" violation of chapter 93A.  Therefore, Plaintiffs are entitled to multiple damages.  Additionally, the Court finds the degree of Defendants' willfulness deserving of treble damages, not double.

## 2.    Joint and Several v. Independent Liability

Multiple defendants who willfully violate Massachusetts antitrust law and who are therefore liable for double or treble damages are independently liable for the punitive portion of the award.  Interpreting the damages provision of section 9, the Supreme Judicial Court of Massachusetts found that unlike federal law—where liability does not vary with the degree of a defendant's culpability but at the same time is joint and several—the Massachusetts legislature struck a different balance and drafted a rule where a defendant's liability is measured by the

22

degree of liability.  *Int'l Fidelity*, 443 N.E.2d at 1316-17.  Based on *International Fidelity*,

Defendants are independently liable for any punitive portion of a multiple damages award.

Defendants object to the imposition of independent liability on several grounds.  First,  if

Defendants are independently liable for punitive damages and damages are trebled, pursuant to a

private indemnification agreement between Defendants, Mylan would pay seven times the actual

jury award.  Defendants maintain such an award is violative of the Due Process Clause of the

14th Amendment.  Second, Defendants submit Plaintiffs effectively waived their claim for

independent liability by failing to raise the issue in either the complaint or final pretrial

statement.  Both arguments are unavailing.

### a.      Indemnification Agreement

Pursuant to an indemnification agreement, Mylan submits it must pay for any damages its

co-defendants sustain.  If treble damages are ordered, they argue, Mylan would be liable for

roughly $59 million in damages, or seven times the actual award.  Defendants submit the

resulting 6:1 ratio violates Due Process.  Specifically, Defendants' argue that, although the

Supreme Court has not identified "concrete constitutional limits" on the ratio, the Court noted in

both *State Farm* and *Gore* that a 4 to 1 ratio of punitive damages to actual harm is "instructive."

*State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424 (2003).  And the

Massachusetts Supreme Judicial Court acknowledged in *International Fidelity* that chapter 93A

was subject to two possible interpretations with regard to liability.  Defendants argue that,

because chapter 93A is susceptible to two interpretations (i.e., independent liability v. joint and

several liability), and because in this case one interpretation (independent liability) would lead to

a decision that may be constitutionally infirm (6:1 ratio is violative of the Due Process Clause),

the doctrine of constitutional avoidance requires this Court to interpret the statute in a way that

does not require it to reach the constitutional decision.  Specifically, Defendants urge the Court to find—notwithstanding *International Fidelity*—that liability is joint and several.

Defendants' argument fails because it uses as its starting point the indemnification agreement, which is the only way *treble damages* could be characterized as a "6:1 ratio." Notwithstanding whether a 6:1 ratio is violative of the Due Process clause, if the Court awards treble damages it would be more appropriately characterized as a 3:1 ratio assessed against three different defendants.  By private agreement and for its own reasons, Mylan chose to indemnify its co-defendants.  That decision rests with Defendant, not this Court.  Accordingly, the indemnification agreement's existence has no bearing on the Court's damages analysis.

### b.       Pretrial Statement

Second, Defendants argue that Plaintiffs essentially waived a claim for independent liability because Plaintiffs' complaint, as well as the final pretrial statement, stated that Plaintiffs sought treble damages "jointly and severally."

Local Rule 16.5(b) requires the parties to submit a Final Pretrial Statement that includes, among other items, a statement of claims made by the party.  LCvR 16.5(b)(1)(ii).  As soon as is practicable following the pretrial statement, the Court or Magistrate Judge enters a Final Pretrial Order that governs the remainder of the case.  LCvR 16.5(a)(3).

Defendants rely on *Smith v. Washington Sheraton Corp.*, 135 F.3d 779 (D.C. Cir. 1998) for the proposition that pretrial statements are binding.  In *Smith*, the circuit court held Sheraton was bound by the pretrial order that incorporated the pretrial statements, and Sheraton failed to dispute ownership of the property in the pretrial statement when it was clearly at issue and had thereby admitted that fact.  *Id*. at 784.  Plaintiffs response is threefold: "(1) [Defendants' argument] ignores BCBS-MA's pleading and pursuit of treble damages throughout this litigation;

(2) it is the Court's role to determine the award of multiple damages pursuant to the law of this case regardless of what is pled by the parties; and (3) Defendants have suffered no prejudice." Reply, 15.  Plaintiffs' argument is compelling.

Plaintiffs clearly sought treble damages jointly and severally in the final pretrial statement.  However, as Plaintiffs point out, both the complaint and the pretrial statement make references to treble damages against *all* defendants for chapter 93A violations.  Because chapter 93A permits joint and several liability for compensatory damages but not punitive damages, pleading joint and several liability under 93A, while simultaneously seeking treble damages against *each* defendant is consistent with Massachusetts law and sufficient to put Defendants on notice.

Moreover, Fed. R. Civ. P. 54(c) states that "every final judgment shall grant the relief to which the party is entitled, even if the party has not demanded such relief in the party's pleadings."  Accordingly, "[a]dherence to the particular legal theories . . . suggested by the pleadings is subordinated to the court's duty to grant the relief which the prevailing party is entitled, whether it has been demanded or not."  Wright and Miller, *Federal Practice and Procedure*, § 2664.  As Plaintiffs concede, where failure to ask for a particular relief substantially prejudices the opposing party, "Rule 54(c) does not sanction the granting of relief not prayed for in the pleadings."  *Rental Dev. Corp. v. Lavery*, 304 F.2d 839, 842 (9th Cir. 1962).  Defendants, however, make no claim that they relied on the complaint or pretrial statement to their detriment. This Court, therefore, must "grant the relief to which the party is entitled."  Wright and Miller, § 2664.  Because neither the indemnification agreement nor the pretrial statement saves Defendants from Massachusetts law on antitrust damages, Defendants are independently liable for the punitive portion of the award.  Accordingly, (a) Mylan, Gyma, and Cambrex are jointly and

several liable for compensatory damages in the amount of $8,354,621.00; (b) Mylan Laboratories

is independently liable for punitive damages in the amount of $16,709,242.00; (c) Gyma is

independently liable for punitive damages in the amount of $16,709,242.00; and, (d) Cambrex is

independently liable for punitive damages in the amount of $16,709,242.00.

### B.      Blue Cross Blue Shield of Minnesota and Federated Mutual Insurance Company

Under Minnesota law, "[a]ny person . . . injured directly or indirectly . . . shall recover

three times the actual damages sustained . . . including reasonable attorney's fees."  Minn. Stat. §

325D.57 (2004).  And "Minnesota antitrust laws do not provide the trial court with discretion to

determine the multiple of damages." *Phelps v. Commonwealth Land Title Ins. Co.,* 537 N.W.2d

271, 279 (Minn. 1995).

Both BCBS-MN and Federated submit Minnesota law mandates the Court to award treble

damages.  Plaintiffs are correct.  *See* Minn. Stat. § 325D.57; *Phelps*, 537 N.W.2d at 279.

Defendants do not dispute treble damages are mandated, but argue instead Defendants are

entitled to remittittur, and therefore Plaintiffs are entitled to only a fraction of the damages

awarded by the jury.  Def. Opp'n n.2.  However, because the Court will deny the remittitur

motion with the exception of the self-funded plans that opted out of the litigation, and because

the Court will deny the motion to dismiss, the Court will grant the motion for treble damages

with respect to both BCBS-MN and Federated.  The jury awarded BCBS-MN $1,756,096.00 and

Federated $410,878.00.  Accordingly, after adjusting the award for BCBS-MN from

$1,756,096.00 to $1,755,038.00 to reflect the self-funded plans that opted out of the litigation

($1,058.00), the Court will award Plaintiff BCBS-MN $5,265,114.00.  And the Court will award

Plaintiff Federated $1,232,634.00

C.      **Health Care Services Corporation**

The jury awarded HCSC $1,448,437.00 in damages, and Plaintiff moves the Court to treble those damages.  Under Illinois law, the Court may award up to three times the amount of actual damages for willful violations of the antitrust statute.[10]  740 Ill. Comp. Stat. 10/7(2).  For the same reasons articulated above, the Court finds Defendants' conduct was willful, and the degree of such willfulness merits treble damages.  Accordingly, the Court will award Plaintiff HCSC $4,345,311.00.

An appropriate order accompanies this memorandum opinion.

January 24, 2008                                    _____/s/_____
                                                    Thomas F. Hogan
                                                      Chief Judge

---

[10]  The statute reads: "[T]he person injured shall recover the actual damages caused by the violation, together with costs and reasonable attorney's fees, and if it is shown that such violation was willful, the court may, in its discretion, increase the amount recovered as damages up to a total of 3 times the amount of actual damages."  740 Ill. Comp. Stat. 10/7(2).